IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BEST EFFORT FIRST TIME, LLC, et al.,   :

      Plaintiffs,                      :

v.                                 :       Civil Action No. GLR-17-825

SOUTHSIDE OIL, LLC            :

      Defendant.                   :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Southside Oil, LLC's ("Southside") Motion to Dismiss (ECF No. 20) and Motion to Compel Arbitration (ECF No. 24). This action arises from a contract dispute between Southside, a wholesale distributor of ExxonMobil fuels, and Plaintiffs, who are ten Maryland retail gasoline stations.[1] The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will grant in part and deny in part both Motions.[2]

---

[1] Specifically, the ten plaintiffs are Best Effort First Time, LLC, HMA, Inc., AJ&R Petroleum, Inc., Fuel Management, Inc., Energy Management, Inc., Duncan Services, Inc., Japan Plus, Inc., Japan Plus Two, Inc., Japan Plus Four, Inc., and Jamal & Luqman, Inc.

[2] Also pending before the Court are two additional Motions. The first is Southside's Motion to Seal (ECF No. 23), to which Plaintiffs have no objection. The second is Plaintiffs' Motion to Preclude Consideration of an Argument Made for the First Time in Reply Brief or, in the Alternative, for Leave to File a Limited Surreply (ECF No. 35).

# I.    BACKGROUND[3]

In 2009, Exxon sold its marketing assets, including some gas stations. (Am. Compl. ¶ 6, ECF No. 14). Southside bought Exxon-branded motor fuels for resale directly from ExxonMobil under a dealer agreement. (Id. ¶ 5). The Plaintiffs' stations were some of those sold from ExxonMobil to Southside. (Id. ¶ 6). Under the dealer agreement, Southside would step into the shoes of ExxonMobil as Plaintiffs' landlord and supplier of motor fuels. (Id.). Prior to closing the deal, Plaintiffs in this case, along with others, instituted lawsuits against ExxonMobil and proposed purchasers, including Southside. (Id. ¶ 7). The lawsuits were settled on the basis of individualized agreements between Southside and each Plaintiff (the "Settlement Agreements"). (Id. ¶ 8).

Included in the Settlement Agreements were terms permitting Plaintiffs to purchase the service stations they had previously leased from Exxon. (Id. ¶ 9). Each Plaintiff's right to purchase was conditioned on the Plaintiffs each entering into twenty-year motor fuel supply contracts with Southside (the "Supply Contracts"). (Id.). The

---

The Court will grant the unopposed Motion to Seal for the reasons Southside states in its Motion. The Court will also grant the Motion to Preclude Consideration because in its Reply, Southside offers a new argument for why the Court should dismiss Plaintiffs' Robinson-Patman Act claim (Count III): Plaintiffs allege that they were subject to different contractual terms than their competitors. (See Reply at 10–11, ECF No. 33). This argument is based on Plaintiffs' allegations in their Complaint, and thus, should have been raised in Southside's initial Motion to Dismiss. Because Southside instead raised the argument for the first time in its Reply, the Court will not consider it and will grant Plaintiffs' Motion. United States v. Freeman, No. PWG-16-197, 2016 WL 6582645, at *4 (D.Md. Nov. 7, 2016) (quoting Clawson v. FedEx Ground Package Sys., Inc., 451 F.Supp.2d 731, 734 (D.Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.")).

[3] Unless otherwise noted, the Court takes the following facts from Plaintiffs' Amended Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

Settlement Agreements required each Plaintiff to purchase all of its motor fuel from Southside for the twenty-year term of the Supply Contracts, and purchase a minimum number of gallons every year. (Id.).

Negotiations of the Settlement Agreements focused on the per gallon price for each grade of gasoline and diesel fuel in the Supply Contracts. (Id. ¶ 10). Plaintiffs sought a price that would enable their business to be profitable and meet the minimum volume requirement. (Id.). Plaintiffs also wanted to limit the amount Southside could increase the prices of gasoline and fuel, so they did not want an "open-price term" contract with Southside. (Id. ¶¶ 10–11). An open-price term contract does not place a limit on the per gallon profit the seller can earn; the seller can increase the price of the product over its cost with no ceiling. (Id. ¶ 12).

Instead, Plaintiffs and Southside agreed on a "Rack Plus" pricing formula. The "Rack Plus" pricing formula includes two numbers: (1) the rack price and (2) the mark-up price. A rack price is the per gallon price charged by the refiners (like ExxonMobil) to distributors (like Southside) when distributors purchase gasoline in full transport loads. The rack price is the distributor's cost of the product. (Id. ¶¶ 13–15). The mark-up price is the amount Southside can mark-up the products sold to Plaintiffs over and above the rack price. Put differently, the mark-up price is the amount Southside would add to the rack price as a profit margin. (Id. ¶ 16–17). For example, a rack plus two means Plaintiffs are charged a price that is two cents per gallon above the rack price. Southside and Plaintiffs agreed that Southside would add a cents-per-gallon mark up between 1.5 and 6.5 cents, depending on the particular Supply Contract between Southside and each

Plaintiff.  (Id. ¶ 17).  An additional two cents is added for federal and state taxes, environmental fees, and freight charges.  (Id. ¶ 18).  Each Plaintiff signed a separate Supply Contract and agreed upon a particular cents-per-gallon amount (between 1.5 and 6.5 cents per gallon) to govern the purchases under the applicable Supply Contract.  (Id. ¶ 26).

The Supply Contracts also contained identical arbitration provisions (the "Arbitration Provisions").  (Id. ¶ 30).  The Arbitration Provisions provide: "Any monetary claim arising out of or relating to this agreement, or any breach thereof, shall be submitted to arbitration . . . in accordance with the rules of the American Arbitration Association . . . ."  (Def.'s Mot. Dismiss Ex. 3 ["Supply Contract"] ¶ 34, ECF No. 20-4) (emphasis added).  Additionally, the Arbitration Provisions permit Southside to "bring[] any action in any court of competent jurisdiction for injunctive or other provisional relief . . . necessary or appropriate to compel [Plaintiffs] to comply with its obligations" or "to protect [Southside's] trademark rights or obligations or other property rights . . . ."  (Id.). The Arbitration Provisions also permits Southside to "join[] with any action for injunctive or provisional relief all monetary claims . . . which arise out of the acts or omissions . . . giving rise to the action for injunctive or provisional relief."  (Id.).  Finally, the Arbitration Provisions provides that either party may "seek and obtain temporary injunctive relief from a court of competent jurisdiction in accordance with applicable law against threatened conduct that will cause loss or damage, pending completion of the arbitration."  (Id.).

In 2015, Southside began charging Plaintiffs a per gallon price for Exxon branded

fuel that was considerably more than the rack price plus the cents per gallon amount. (Id. ¶ 38). Southside charged Plaintiffs a mark-up price as high as twelve or thirteen cents, which resulted in a 400% increase in Southside's profits. (Id.). This price difference occured because ExxonMobil and Southside reached an agreement where ExxonMobil would provide its motor fuels at a per gallon price that was lower than the price charged to other distributors. Southside, therefore, treated the prices charged by ExxonMobil to other distributors as the rack price, but thought the discounted price they personally received was "something different." (Id. ¶ 39).

At this time, Plaintiffs learned that the prices charged by Southside to other Maryland Exxon dealers with open-price term contracts were "considerably lower than the prices charged by Southside to plaintiffs for the very same products, at the very same time." (Id. ¶ 40). Plaintiffs requested Southside provide ExxonMobil's rack prices for the products so they could determine if Southside was charging them more than the permitted cents-per-gallon amounts. (Id.). Southside provided Plaintiffs with price information that showed Southside's prices to Plaintiffs were considerably higher than the applicable cents-per-gallon amount above the rack prices, despite Southside's claim that they were not. (Id. ¶¶ 41, 43).

Southside told Plaintiffs that the prices Southside actually paid to ExxonMobil were not the rack prices within the meaning of the contractual agreement. (Id. ¶ 42). Rather, the "rack prices" were the prices ExxonMobil charged other distributors who did not have a special discounted agreement. (Id. ¶ 43). Southside stated the per gallon prices they charged Plaintiffs were no more than the cents-per-gallon amounts plus the

prices ExxonMobil charged other distributors, even though Plaintiffs' prices were around twelve cents or more above the amount Southside actually paid to ExxonMobil. (Id. ¶ 43).

Based on the differences in prices, Plaintiffs had to compete with lower-priced retailers in the same market area who also purchased fuel from Southside. In order to earn a profit, Plaintiffs had to raise their retail prices above a competitive level. (Id. ¶ 45). As a result, Plaintiffs lost business to their lower-priced competitors, including the other Maryland Exxon dealers who purchased from Southside at lower prices. (Id.).

Plaintiffs filed the present action on March 27, 2017 against Southside. (ECF No. 1). In their five-count Complaint, they allege: Beach of Contract—Pricing (Count I); Beach of Contract—Rebates (Count II); violation of 15 U.S.C. § 13—Price Discrimination (Count III); Lack of Consideration for the Arbitration Provision (Count IV); and Arbitration Provision—Unlawful Waiver of Rights. (Id. ¶¶ 48–81). Plaintiffs seek declaratory judgments and a permanent injunction. (Id.).

Southside now moves to dismiss each count for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), filing their Motion on May 12, 2017. (ECF No. 20). Southside contemporaneously filed a Motion to Compel Arbitration, seeking to compel arbitration for each count. (ECF No. 24). Plaintiffs filed an opposition to each Motion on June 9, 2017. (ECF Nos. 31, 32). Defendants filed a reply supporting each Motion on June 23, 2017. (ECF Nos. 33, 34).

## II.  DISCUSSION

### A.  <u>Standard of Review</u>

#### 1.  Motion to Compel Arbitration

The standard of review on a Motion to Compel Arbitration pursuant to the Federal Arbitration Act is "akin to the burden on summary judgment." <u>Novic v. Midland Funding, LLC</u>, 271 F.Supp.3d 778, 778 (D.Md. 2017) (quoting <u>Galloway v. Santander Consumer USA, Inc.</u>, 819 F.3d 79, 85 (4th Cir. 2016) (internal quotation omitted)).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

#### 2.  Motion to Dismiss for Failure to State a Claim

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint,"

not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243–44 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of Am., NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual

events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

**B.    Analysis**

**1.    Motion to Compel Arbitration**

A court resolving an arbitrability dispute must engage in a two-step inquiry. Peabody Holding Co., LLC v. United Mine Workers of Am., 665 F.3d 96, 101 (4th Cir. 2012). First, the court must determine who decides whether a particular dispute is arbitrable—the arbitrator or the court. Id. Second, if the court determines that it is the proper forum to adjudicate arbitrability, then the court must decide whether the dispute is in fact arbitrable. Id. (alteration in original).

**i.    The Proper Forum to Determine Arbitrability**

At bottom, the Court concludes that it is the proper forum to determine the arbitrability of Plaintiffs' claims.

Arbitrability is an issue for judicial determination unless the agreement "'clearly and unmistakably' provide[s] that the arbitrator shall determine what disputes the parties agreed to arbitrate." Id. at 102 (citations omitted). Although this is an exacting standard, "[v]irtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." Oracle Am., Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074 (9th Cir. 2013).

The United States Court of Appeals for the Fourth Circuit has yet to rule on this precise issue as it relates to incorporation of the AAA rules. However, the Fourth Circuit

has recently adopted the reasoning of the majority of its sister circuits with respect to another category of arbitration rules, holding that "the explicit incorporation of JAMS [Comprehensive Rules & Procedures] serves as 'clear and unmistakable' evidence of the parties' intent to arbitrate arbitrability." Simply Wireless, Inc. v. T-Mobile US, Inc., 877 F.3d 522, 528 (4th Cir. 2017).

In Simply Wireless, the Fourth Circuit held that the parties had clearly and unmistakably agreed to arbitrate the issue of arbitrability where the agreement provided, in part: "Any claims or controversies . . . arising out of or relating to this Agreement . . . shall be resolved by submission to binding arbitration . . . . The arbitration shall be administered pursuant to the JAMS Comprehensive Rules and Procedures then in effect." Id. at 525 (first alteration in original). Similarly, the Ninth Circuit held in Oracle that the parties had expressly delegated the issue of arbitrability to an arbitrator where the parties agreed that "[a]ny dispute arising out of or relating to this License shall be finally settled by arbitration" to be "administered . . . by the American Arbitration Association . . . ." 724 F.3d at 1071.

In fact, of the circuits that have considered this issue, every court has held that incorporation of AAA rules constitutes clear and unmistakable evidence of the parties' intent to arbitrate arbitrability where parties agreed to arbitrate all claims and disputes arising out of or relating to the underlying agreement. See Petrofac, Inc. v. DynMcDermott Petrol. Operations Co., 687 F.3d 671, 675 (5th Cir. 2012) (holding that the parties agree "[t]hey shall submit to binding arbitration . . . all claims and disputes between them arising out of or relating to the Subcontract."); Republic of Arg. v. BG

Grp. PLC, 665 F.3d 1363, 1371 (D.C. Cir. 2012); Fallo v. High-Tech Inst., 559 F.3d 874, 876, 880 (8th Cir. 2009) ("Any controversy or claim arising out of or relating to this Agreement, or breach thereof, no matter how pleaded or styled, shall be settled by arbitration in accordance with the Commercial Rules of the American Arbitration Association . . . ."); Awuah v. Coverall N. Am., Inc., 554 F.3d 7 (1st Cir. 2009); Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1372–73 (Fed. Cir. 2006) ("Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach or validity hereof, shall be settled by arbitration in accordance with the arbitration rules of the American Arbitration Association . . . ."); Terminix Int'l Co., LP v. Palmer Ranch Lt'd. P'Ship, 432 F.3d 1327, 1332 (11th Cir. 2005); Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005) ("In the event of any controversy arising with respect to this Agreement . . . such controversy shall be determined by arbitration . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association . . . .").

Nonetheless, the Court should not leave the issue of arbitrability to an arbitrator if "a party's assertion that a claim falls within an arbitration clause is frivolous or otherwise illegitimate." Simply Wireless, 877 F.3d at 529. In fact, where parties have agreed to arbitrate only some issues, an arbitrator does not have authority to decide the arbitrability of a party's claim that clearly falls outside the scope of the arbitration clause. See Douglas v. Regions Bank, 757 F.3d 460, 464 (5th Cir. 2014) ("[E]ven if there is a delegation provision (step one), the court must ask whether the averment that the claim falls within the scope of the arbitration agreement is wholly groundless (step two)."); Turi v. Main Street Adoption Servs., LLP, 633 F.3d 496, 511 (6th Cir. 2011) ("[E]ven where

the parties expressly delegate to the arbitrator the authority to decide the arbitrability of the claims related to the parties' arbitration agreement, this delegation applies only to claims that are at least <u>arguably</u> covered by the agreement."); <u>Qualcomm</u>, 466 F.3d at 1371 ("If . . . the court concludes that the parties to the agreement did clearly and unmistakably intend to delegate the power to decide arbitrability to an arbitrator, then the court should perform a second, more limited inquiry to determine whether the assertion of arbitrability is wholly groundless." (internal quotation marks omitted)). Accordingly, a court may not delegate the question of arbitrability to an arbitrator if "it is clear that the claim of arbitrability is wholly groundless." <u>Local No. 358, Bakery & Confectionery Workers Union v. Nolde Bros., Inc.</u>, 530 F.2d 548, 553 (4th Cir. 1975), <u>aff'd</u>, 430 U.S. 243 (1977).

Here, the Arbitration Provisions provide: "Any <u>monetary claim</u> arising out of or relating to this agreement, or <u>any breach thereof</u>, shall be submitted to arbitration . . . in accordance with the rules of the American Arbitration Association . . . ." (Supply Contract ¶ 34) (emphasis added). Thus, unlike the parties in <u>Simply Wireless</u> and <u>Oracle</u>, the parties have not incorporated the AAA rules as to all claims arising out of the agreement. Rather, the parties have only agreed to arbitrate the arbitrability of claims for monetary damages and breach of contract.

Plaintiffs, however, assert claims for declaratory judgment, not monetary damages or breach of contract. (Am. Compl. ¶¶ 48–81). Southside attempts to argue that Plaintiffs' claims for declaratory judgment still fall within the scope of the parties' arbitration clause. Although underlying Plaintiffs' claims is Southside's alleged breach

of contract, Southside cannot escape the fact that Plaintiffs seek declaratory relief, not a remedy for breach of contract. Thus, any claim that the parties clearly and expressly agreed to arbitrate the arbitrability of Plaintiffs' declaratory judgment claims is "wholly groundless." Local No. 358 Bakery, 530 F.2d at 553.

The Court, therefore, concludes that it, not an arbitrator, is the proper forum to determine arbitrability.

### ii.     Enforceability of the Arbitration Provisions

Given that the Court is the proper forum to determine arbitrability, this Court must next consider whether the claims in the present case are in fact arbitrable. In brief, the Court concludes that the claims are in fact arbitrable because the Arbitration Provisions are enforceable[4] under Maryland law.[5]

"[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide." Peabody, 665 F.3d at 104–05 (quoting Granite Rock Co. v. Int'l Bhd. of Teamsters, 130 S. Ct. 2847, 2855–56, (2010)). Thus, prior to ruling on the arbitrability of other claims, this Court must first "carefully consider any claims that the . . . arbitration clause [] was not executed properly." Peabody, 665 F.3d at 104 (citing Granite Rock, 130 S.Ct. at 2855–59). When deciding whether the parties formed a valid agreement to arbitrate a certain matter, courts generally apply ordinary state-law principles that govern the formation of contracts. See First Options of Chi., Inc. v.

---

[4] While the Court concludes that the claims are in fact arbitrable because the Arbitration Provisions are enforceable, as the Court will explain below, it will still deny the Motion to Compel for Counts III–V because they are outside the scope of the Arbitration Provisions.

[5] The parties do not dispute that Maryland law applies.

Kaplan, 514 U.S. 938, 944 (1995).

Plaintiffs allege in Count IV that the arbitration agreement is not supported by consideration. (Am. Compl. ¶¶ 71–75). In Count V, Plaintiffs allege that the arbitration provision constitutes an unlawful violation of the Petroleum Marketing Practices Act. (Id. ¶¶ 76–81). Accordingly, this Court must evaluate Plaintiffs' substantive allegations that the arbitration provision is invalid and unenforceable under Maryland law before ruling on the arbitrability of the Counts. See Peabody, 665 F.3d at 104–05.

### a.    Consideration

Plaintiffs first argue that the Arbitration Provisions are not enforceable because they are not supported by consideration. The Court disagrees.

Under Maryland law, an agreement to arbitrate is enforceable if it is a valid contract. Hill v. Peoplesoft USA, Inc., 412 F.3d 540, 543 (4th Cir. 2005) (citing Cheek v. United Healthcare of Mid-Atlantic, Inc., 835 A.2d 656, 661 (Md. 2003)). To be binding and enforceable, a contract must be supported by consideration. Id. A promise becomes consideration for another promise only when it constitutes a binding obligation. Id. (quotations omitted). Unlike a binding obligation, an "illusory promise appears to be a promise, but does not actually bind or obligate the promisor to anything." Id. Therefore, an illusory promise cannot constitute consideration. Id.

In Cheek, the Court of Appeals analyzed whether an arbitration agreement between employer and employee was enforceable where the employer declared in a summary of its arbitration policy that it reserved "the right to alter, amend, modify, or revoke the [arbitration agreement] at its sole and absolute discretion at any time with or

without notice." 835 A.2d at 658. The court held that the arbitration agreement in that instance was invalid because the employer's promise to arbitrate disputes was illusory— indeed, the employer's promise to arbitrate was "no real promise at all." Id. at 662.

The Fourth Circuit, applying Maryland law, has similarly held that an arbitration agreement lacks sufficient consideration and is therefore unenforceable where one party is bound to arbitration but the other party is not. See Noohi v. Toll Bros., Inc., 708 F.3d 599, 610–11 (4th Cir. 2013) (holding that an arbitration agreement lacked mutuality of consideration where only one party was bound to arbitration); Howard v. King's Crossing, Inc., 264 F.App'x. 345, 347 (4th Cir. 2008) (per curiam) (holding that the agreement that required one party to arbitrate while the other party reserved the ability to seek specific performance and damages in any court of competent jurisdiction was illusory); see also Caire v. Conifer Value Based Care, LLC, 982 F.Supp.2d 582, 592–93 (D.Md. 2013) (finding no mutual obligation because the arbitration clause explicitly obligated only one party to arbitrate).

In Walther v. Sovereign Bank, 872 A.2d 735, 748 (Md. 2005), however, the court held that an arbitration agreement did not lack mutual promises where the arbitration clause permitted one party to litigate some claims instead of having to submit them to arbitration. The court noted that mutuality "does not require an exactly even exchange of identical rights and obligations between the two contracting parties" for an arbitration agreement to be valid. Id. Accordingly, the fact that an arbitration clause carves out limited exceptions for one party does not destroy mutuality, nor does it render the agreement illusory. Id.; see also Taylor v. Santander Consumer USA, Inc., No. DKC 15–

0442, 2015 WL 5178018, at *7 (D.Md. Sept. 3, 2015) (noting that an arbitration agreement is enforceable as long as the parties "unambiguously g[i]ve up a right to bring suits in court for at least some disputes").

The arbitration provision at issue here is more like the agreement in Walther than those in Cheek or Noohi because it binds Southside to arbitrate some claims, subject to limited exceptions. The arbitration agreement unambiguously requires both parties to submit claims for monetary damages or breach of contract to arbitration. Nonetheless, the agreement permits Southside to "bring[] any action in any court of competent jurisdiction for injunctive or other provisional relief . . . necessary or appropriate to compel [Plaintiffs] to comply with its obligations" or "to protect [Southside's] trademark rights or obligations or other property rights . . . ." (Supply Contract ¶ 34). The agreement also permits Southside to "join[] with any action for injunctive or provisional relief all monetary claims . . . which arise out of the acts or omissions . . . giving rise to the action for injunctive or provisional relief." (Id.). These narrow exceptions to the parties' agreement to arbitrate do not render Southside's promise to arbitrate illusory. An agreement to arbitrate is still enforceable even where there is not "an exactly even exchange of identical rights and obligations between the two contracting parties . . . ." Walther, 872 A.2d at 748. Here, the mutuality requirement is satisfied because Southside has given up the "right to bring suits in court for at least some disputes." Taylor, 2015 WL 5178018, at *7. Thus, the Court concludes that the Arbitration Provisions are

supported by consideration.[6]

### b. The Petroleum Marketing Practices Act

Plaintiffs also allege that the Arbitration Provisions are unenforceable because they violate the Petroleum Marketing Practices Act ("PMPA"). Section 2805(f) of the PMPA provides: "[n]o franchisor shall require, as a condition of entering into or renewing the franchise relationship . . . a franchisee to release or waive . . . any right that the franchisee has under this title or other Federal law, or any right that the franchisee may have under any valid and applicable State law." Plaintiffs contend that the Arbitration Provisions in the Supply Contract violate the PMPA because they require Plaintiffs to waive their federal and state right to a jury trial as a condition of renewing their franchise relationships.

Importantly, however, Plaintiffs can only bring claims for violations of § 2805(f)(1) of the PMPA if those violations constitute a nonrenewal of their franchise relationship under the statute. Korangy v. Mobil Oil Corp., 84 F.Supp.2d 660, 664 (D.Md. 2000). Here, because Plaintiffs do not allege that Southside's conduct constitutes a termination or nonrenewal of the franchise relationship, Plaintiffs do not have a federal right of action against Southside under the PMPA.[7]

In sum, Plaintiffs have not provided any basis for the Court to conclude that the

---

[6] In Count IV, Plaintiffs seek a declaratory judgment that the Arbitration Provisions are unenforceable for lack of consideration. As the Court will describe below, Count IV is not arbitrable. For the aforementioned reasons, therefore, the Court will dismiss Count IV for failure to state a claim upon which relief may be granted.

[7] In Count V, Plaintiffs seek a declaratory judgment that the Arbitration Provisions are unenforceable under the PMPA. As the Court will describe below, Count V is not arbitrable. For the aforementioned reasons, therefore, the Court will dismiss Count V for failure to state a claim upon which relief may be granted.

Arbitration Provisions are unenforceable under Maryland law. They are supported by consideration and Plaintiffs do not sufficiently allege a violation of the PMPA.

### iii.     Arbitrability of Counts I–V

Because the Court is the proper forum to determine arbitrability and the arbitration agreement is enforceable, the Court must next consider whether the remaining claims are in fact arbitrable. At bottom, Counts I and II are arbitrable, but Counts III–V are not.

### a.     Counts I, II, IV, and V

The Court concludes that Counts I and II are arbitrable because Plaintiffs attempt to circumvent the parties' binding arbitration agreement by bringing declaratory judgment claims for legal issues that are delegated to arbitration.

In Peabody, the Fourth Circuit noted that courts should not "accept a party's invitations to critically appraise the merits of the underlying dispute" nor "sanction obfuscation designed to shepherd an otherwise-arbitrable grievance into court." 665 F.3d at 104. At the arbitrability stage, courts "have no business weighing the merits of the grievance . . . or determining whether there is particular language in the written instrument which will support the claim." Id. (quoting AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (internal quotation omitted)). Moreover, because courts are "[c]ognizant that parties are able to craft cleverly phrased arguments in an attempt to secure a judicial forum to hear an underlying claim," the Fourth Circuit instructed that courts should not "permit a party to wiggle out of an obligation to which it has agreed." Id. (quoting United Steel Workers Int'l Union v. Cont'l Tire N.A., Inc., 568 F.3d 158, 166 (4th Cir. 2009)).

Here, both parties have clearly agreed to submit to arbitration "[a]ny monetary claim arising out of or relating to this Agreement, or any breach thereof . . . ." (Supply Contract ¶ 34). Plaintiffs argue that non-monetary claims, such as claims for declaratory relief, are not within the scope of the clause. Plaintiffs, then, maintain that they are entitled to submit their claims for declaratory judgment to any court of competent jurisdiction. The Court disagrees.

A close inspection of Plaintiffs' complaint reveals that the declaratory judgment claims are "designed to shepherd [] otherwise-arbitrable grievance[s] into court." Peabody, 665 F.3d at 104. Plaintiffs and Southside have unmistakably agreed to arbitrate claims for monetary damages and breach of contract. Yet Plaintiffs allege in Count I— which is styled as a claim for "Declaratory Judgment – Breach of Contract – Pricing"— that Southside is "liable to the [P]laintiffs for the acts or omissions of Southside that constitute material breaches of the Supply Contract . . . ." (Am. Compl. ¶ 52). Further, Count I demands from this Court a declaratory judgment providing that, among other things, "Southside materially breached each [P]laintiff's Supply Contract . . . ." (Id. ¶ 53(a)). Similarly, Plaintiffs allege in Count II that Southside is "liable to the applicable [P]laintiffs for the acts or omissions of Southside that constitute the breaches of each Supply Contract" and seeks a declaratory judgment that "Southside materially breached each [P]laintiff's Supply Contract . . . ." (Id. ¶¶ 56, 57(a)).

The Court, therefore, concludes that Plaintiffs couch their breach of contract claims as requests for declaratory relief "in an attempt to secure a judicial forum to hear an underlying claim." Peabody, 665 F.3d at 104. Accordingly, the Court will grant

Southside's Motion as to Counts I and II of Plaintiffs' Complaint and compel Plaintiffs to arbitrate those claims.[8]

### b.    Count III

The Court concludes that Count III is not arbitrable because Plaintiffs and Southside did not agree to arbitrate claims for permanent injunctive relief.

Even where parties have entered into a valid arbitration agreement, the Court must determine the scope of arbitrable issues under the agreement.   Bond v. Cricket Commc'ns, LLC, No. WDQ-15-923, 2016 WL 153036, at *2 (D.Md. Jan. 12, 2016) (citing Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 812 (4th Cir. 1989)).   On one hand, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960).   On the other hand, it is well-settled that there is a "healthy regard for the federal policy favoring arbitration."   Monumental, 867 F.2d at 812 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).   Thus, a motion to compel "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."   Id. (quoting United Steelworkers, 363

---

[8] This reasoning, however, does not extend to Counts IV and V even though they also seek declaratory judgments.   Count IV seeks a declaratory judgment that the Arbitration Provisions are unenforceable for lack of consideration.   Count V seeks a declaratory judgment that the Arbitration Provisions are unenforceable for violating the PMPA.   Unlike Counts I and II, Counts IV and V relate only to the enforceability of the Arbitration Provisions and do not touch the underlying contractual dispute.   Thus, Plaintiffs do not couch breach of contract claims as requests for declaratory relief in Counts IV and V.   Accordingly, those Counts properly remain before the Court.

U.S. at 582–83).

As discussed above, the parties have clearly agreed to submit to arbitration "[a]ny monetary claim arising out of or relating to this Agreement, or any breach thereof . . . ." (Supply Contract ¶ 34). The parties' arbitration agreement also unambiguously provides that either party may "seek and obtain <u>temporary injunctive relief</u> from a court of competent jurisdiction in accordance with applicable law against threatened conduct that will cause loss or damage, pending completion of the arbitration." (<u>Id.</u>) (emphasis added). But in Count III of their Complaint, Plaintiffs seek "an order <u>permanently</u> enjoining Southside from continuing the unlawful price discrimination alleged" under the Robinson-Patman Act of 1936 to prevent future losses. (Am. Compl. ¶¶ 66, 70(b)) (emphasis added). Plaintiffs allege that "Southside violated the Robinson-Patman Act . . . by contemporaneously selling products of like grade and quality at different prices to similarly situated dealers . . . ." (<u>Id.</u> ¶ 60). According to Plaintiffs, they have suffered a severe and substantial loss of retail customers, income, and profits as a result of Southside's acts of price discrimination. (<u>Id.</u> ¶ 66). Plaintiffs also note that private parties may seek injunctive relief against threatened loss or damage resulting from a violation of the Robinson-Patman Act. (<u>Id.</u> ¶ 67) (quoting 15 U.S.C. § 26).

The Court can declare "with positive assurance" that the parties here have not agreed to arbitrate claims for permanent injunctions. <u>Monumental</u>, 867 F.2d at 812 (quoting <u>United Steelworkers</u>, 363 U.S. at 582). Nor is the arbitration clause "susceptible of an interpretation" that the parties agreed to arbitrate claims for permanent injunctions. <u>Id.</u> (quoting <u>United Steelworkers</u>, 363 U.S. at 582). At most, the parties have agreed to

arbitrate monetary and breach of contract claims and claims for temporary injunctive relief. Thus, Plaintiffs' claim for permanent injunction under the Robinson-Patman Act is not arbitrable and must be decided by the Court.

In sum, Counts I and II are arbitrable, but Counts III–V are not. Accordingly, the Court will grant Southside's Motion to Compel as to Counts I and II and deny the Motion as to Counts III–V. Because Counts III–V remain, the Court turns to Southside's Motion to Dismiss and considers whether each of these counts states a claim upon which relief may be granted.

### 2.    Motion to Dismiss

In brief, the Court concludes that Count III sufficiently states a claim, while Counts IV and IV do not.

Plaintiffs premise Count III on the Robinson-Patman Act of 1936 ("RPA"). The RPA, an amendment to § 2a of the Clayton Antitrust Act, prohibits anticompetitive practices by producers, specifically price discrimination. 15 U.S.C. § 13 et seq. (2018). A violation of the RPA occurs when a business sells two of the same or similar products at different prices to different buyers within a brief period and those sales cause injury to competition. Id. at § 13(a). Section 13(a) of the RPA states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition . . . .

There are three categories of competitive injuries that give rise to an RPA claim: primary

line, secondary line, and tertiary line. See Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 176 (2006). Here, Plaintiffs allege a secondary-line injury. Such injury involves price discrimination that injures competition among the discriminating seller's customers, typically referring to "favored" and "disfavored" purchasers. Id.; see also Texaco Inc. v. Hasbrouck, 496 U.S. 543, 558 n.15 (1990).

To establish a prima facie case of a secondary-line injury under the RPA, Plaintiffs must show that: (1) the gasoline sales were made in interstate commerce; (2) the gasoline sold to them was of the same grade or quality as that sold to the other buyers; (3) Southside discriminated in price between Plaintiffs and other purchasers of gasoline; and (4) the effect of such discrimination was to injure, destroy, or prevent competition to the advantage of the other purchasers. Volvo Trucks, 546 U.S. at 176. The fourth element may be inferred "from evidence that a favored competitor received a significant price reduction over a substantial period of time." Id. at 177. But "[a]bsent actual competition with a favored [dealer], [a plaintiff] cannot establish the competitive injury required under the Act." Id. If a plaintiff establishes a prima facie case, the defendant may assert one of the affirmative defenses in § 13(b).

Southside asserts that Plaintiffs fail to sufficiently allege the fourth element—competitive injury. In doing so, Southside invites the Court to adopt the pleading standard set forth in Chawla v. Shell Oil Co., 75 F.Supp.2d 626 (S.D.Tex. 1999). The Court declines this invitation. As Southside acknowledges, neither this Court nor the Fourth Circuit has ever adopted such a standard. While this Court has not addressed the pleading standards of a secondary-line RPA claim, sister district courts governed by the

Fourth Circuit have. See Bendfeldt v. Window World, Inc., No. 5:17CV39-GCM, 2017 WL 4274191, (W.D.N.C. Sept. 26, 2017); Aggarwal v. Sikka, No. 1:12CV60, 2012 WL 12870349, (E.D.Va. June 12, 2012); Irwin Indus. Tool Co. v. Worthington Cylinders Wis., LLC, No. 3:08CV291, 2009 WL 606218, (W.D.N.C. Mar. 9, 2009).

The decisions issued by these sister courts provide the Court with adequate guideposts with which to evaluate Plaintiffs' allegations. Mindful of these decisions, the Court now considers whether Plaintiffs sufficiently allege a competitive injury.

### i. Favored Purchasers in a Relevant Market

Southside first asserts that Plaintiffs do not adequately state a competitive injury because they do not allege favored purchasers in a relevant market. The Court disagrees.

In Aggarwal, the court held that plaintiffs failed to allege a competitive injury in part because they "recite the elements" of an RPA claim and do not "identify a single favored purchaser with whom they are in direct competition." 2012 WL 12870349, at *6. In their complaint, the plaintiffs in Aggarwal alleged that there were "other gas stations within 500 miles that receive favorable prices." Id. The court concluded that the plaintiffs failed to "plead facts that make it plausible that they are in actual competition with favored purchasers." Id. The plaintiffs further argued that discovery was needed to determine "if favored purchasers exist," revealing the hypothetical nature of the claim. Id. Similarly, in Bendfeldt, plaintiffs' allegation that they "competed against other window sales and installation businesses" was insufficient. 2017 WL 4274191, at *3.

By contrast, the plaintiffs in Irwin "specifically identif[ied]" competitors by company name and identified the market in which those companies compete, "the sale of

torches and torch-related products." 2009 WL 606218, at *10. These allegations provided "significantly more details than [ ] mere conclusory allegations . . . ." Id.

Here, the other gas stations alleged in the Amended Complaint are not hypothetical—they are customers of Southside. Plaintiffs do not need to determine "if" there are favored purchasers—they allege that there are, in fact, favored purchasers who are fellow customers of Southside. While Plaintiffs refer to the favored purchasers as the "Other Dealers," they explain that they are: (1) operators of Exxon stations in the State of Maryland; (2) that purchased Exxon-branded gasoline; (3) from Southside; (4) under open-price term contracts; and (5) compete in the "same marketing area" in which Plaintiffs' stations are located. (Am. Compl. ¶¶ 40, 44, 61). Plaintiffs' allegations, then, go beyond the allegations in Aggarwal and Bendfeldt and are analogous to the ones in Irwin. Thus, Plaintiffs allege sufficient facts to identify the favored purchasers.

Plaintiffs have also sufficiently alleged a relevant market. The relevant market is the area where sellers compete for sales to a particular customer. Volvo Trucks, 546 U.S. at 179. In Aggarwal, the court concluded that there is "no requirement that plaintiffs plead a precise market area," as long as they plead facts which make it "plausible" that they were in actual competition. 2012 WL 12870349, at *6. There, the plaintiffs failed to do so because "it is not plausible" that plaintiffs in Virginia are in actual competition with "hypothetical stations" 500 miles away "in, for example, New York City, Greensboro, or Knoxville." Id. Here, Plaintiffs identify the market area as the state of Maryland, and limit the favored purchasers to those in Maryland. Thus, Plaintiffs have sufficiently alleged a relevant market.

The Court, therefore, concludes that Plaintiffs have sufficiently alleged favored purchasers in a relevant market.

## ii.    Price Discrimination

Southside next asserts that Plaintiffs do not adequately state a competitive injury because Plaintiffs do not sufficiently allege that Southside discriminated in price and injured competition.  Here, too, the Court disagrees.

In <u>Irwin</u>, the plaintiff alleged enough facts to state that the defendant discriminated in price against the plaintiff and injured competition.  2009 WL 606218, at *11.  There, the plaintiff pled that it was charged "dramatically increased prices," while competing companies received similar goods "at lower prices."  <u>Id.</u>  In addition, the plaintiff stated that as a result, the defendant "injured competition" and "deprived" the plaintiff of "sales and profits to which it was lawfully entitled."  <u>Id.</u>  Even though the court in <u>Irwin</u> recognized that the allegations were "admittedly sparse," they were nonetheless sufficient to allege that the defendant discriminated in price and injured competition.  <u>Id.</u>

Here, similar to the plaintiff in <u>Irwin</u>, Plaintiffs state that in 2015, Southside began charging them a price higher than the "rack price," while other Maryland Exxon dealers were charged "considerably lower" prices.  (Am. Compl. ¶¶ 38–40).  As a "direct and proximate result of [the] acts of discrimination, [they] have sustained a severe and substantial loss of [ ] retail customers and a severe and substantial loss of income and profits."  (<u>Id.</u> ¶ 66).  Specifically, in order to "earn sufficient profits to cover their expenses, [P]laintiffs were required to raise their retail prices to motorists at the Stations . . . result[ing] in [P]laintiffs losing business to their lower-priced competitors."  (<u>Id.</u> ¶

45).  Plaintiffs argue that change in pricing harmed competition and provide additional facts to distinguish the claim, unlike the plaintiff in <u>Bendfeldt.</u>  Thus, the Court concludes that Plaintiffs sufficiently allege that Southside discriminated in price and injured competition.

In sum, Southside does not provide a basis for dismissing Plaintiffs' RPA claim because Plaintiffs sufficiently allege competitive injury.  Accordingly, the Court will deny the Motion to Dismiss as to Count III.[9]

### III.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Southside's Motion to Dismiss (ECF No. 20) and Motion to Compel Arbitration (ECF No. 24).  The Court will deny the Motion to Dismiss without prejudice as to Counts I and II because those Counts will be submitted to arbitration.  The Count will deny the Motion to Dismiss as to Count III.  The Court will grant the Motion to Dismiss as to Counts IV and V.

The Court will grant Southside's Motion to Compel as to Counts I and II.  The Court will deny the Motion to Compel as to Counts III–V.  The Court will order Southside to file an answer within fourteen days.  A separate order follows.

Entered this 30th day of March, 2018

_____/s/_____
George L. Russell, III
United States District Judge

_____

[9] The Court will, however, grant the Motion as to Counts IV and V.  For the reasons the Court stated that the Arbitration Provisions are enforceable, Counts IV and V fail to state a claim upon which relief may be granted.