IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BEST EFFORT FIRST TIME, LLC, et al.,  *

    Plaintiffs,                              *

v.                                         *     Civil Action No. GLR-17-825

SOUTHSIDE OIL, LLC,                        *

    Defendant.                              *

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendant Southside Oil, LLC's ("Southside") Motion for Judgment on the Pleadings (the "Motion for Judgment") (ECF No. 43) and Plaintiffs' Motion for Leave to File a Second Amended Complaint (the "Motion to Amend") (ECF No. 47). This action arises from a contract dispute between Southside, a wholesale distributor of ExxonMobil motor fuels, and Plaintiffs, who are ten Maryland retail gasoline stations.[1] The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant Southside's Motion and deny Plaintiffs' Motion.

### I.    BACKGROUND[2]

In 2009, ExxonMobil sold its marketing assets, including some gas stations. (Am.

---

[1] The ten Plaintiffs are Best Effort First Time, LLC; HMA, Inc.; AJ&R Petroleum, Inc.; Fuel Management, Inc.; Energy Management, Inc.; Duncan Services, Inc.; Japan Plus, Inc.; Japan Plus Two, Inc.; Japan Plus Four, Inc.; and Jamal & Luqman, Inc. (Am. Compl., ECF No. 14).

[2] Unless otherwise noted, the Court takes the following facts from Plaintiffs' Amended Complaint (ECF No. 14) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Compl. ¶ 6, ECF No. 14). Plaintiffs' stations were some of those sold from ExxonMobil to Southside. (Id.). Southside bought Exxon-branded fuel for resale directly from ExxonMobil under a dealer agreement wherein Southside "step[ped] into the shoes of" ExxonMobil as Plaintiffs' landlord and supplier of fuels. (Id. ¶¶ 5–6). Prior to closing the deal, Plaintiffs, along with others, instituted lawsuits against ExxonMobil and the proposed purchasers, including Southside. (Id. ¶ 7). Those lawsuits settled on the basis of individualized agreements between Southside and each Plaintiff (the "Settlement Agreements"). (Id. ¶ 8).

Included in the Settlement Agreements were terms permitting Plaintiffs to purchase the service stations they had previously leased from ExxonMobil. (Id. ¶ 9). Each Plaintiff's right to purchase was conditioned upon entering into twenty-year fuel supply contracts with Southside (the "Supply Contracts"). (Id.). The Settlement Agreements required each Plaintiff to purchase all of its fuel from Southside for the twenty-year term of the Supply Contracts and to purchase a minimum number of gallons every year. (Id.).

The Settlement Agreement negotiations focused on the per-gallon price for each grade of gasoline and diesel fuel in the Supply Contracts. (Id. ¶ 10). Plaintiffs sought a price that would enable their business to be profitable while meeting the minimum volume requirement. (Id.). Plaintiffs also did not want an "open-price term" contract because they wanted to limit the amount Southside could increase the fuel prices. (Id. ¶¶ 10–11). An open-price term contract permits the seller to increase the price to whatever the market will bear. (Id. ¶ 12).

Plaintiffs and Southside ultimately agreed on a "rack plus" pricing formula.

2

(Id. ¶ 13). The "rack plus" pricing formula involves two numbers: the rack price and the mark-up. (Id. ¶ 13). The rack price is the per-gallon price refiners, like ExxonMobil, charge to distributors, like Southside, when distributors purchase fuel in full transport loads. (Id. ¶ 14). The rack price is essentially the distributor's cost for the product. (Id. ¶¶ 13–15). The mark-up is the distributor's built-in profit margin, which when added to the rack price yields the mark-up price. (Id. ¶¶ 16–17).

The Settlement Agreements provided that Southside would add a cents-per-gallon mark-up of between 1.5¢ and 6.5¢, and each Plaintiff negotiated its particular rack-plus price in their individual Supply Contracts with Southside. (Id. ¶¶ 17, 26). The parties also agreed that Plaintiffs would pay federal and state taxes, environmental fees, and freight charges on top of the rack-plus per-gallon price. (Id. ¶ 18). The Supply Contracts contained identical arbitration provisions (the "Arbitration Provisions"), which provided that, "[a]ny monetary claim arising out of or relating to this agreement, or any breach thereof, shall be submitted to arbitration . . ." (Id. ¶ 30).

In 2015, Southside began charging Plaintiffs a per-gallon price that was considerably more than the rack price plus the agreed-upon cents-per-gallon mark-up. (Id. ¶ 38). Southside charged Plaintiffs a mark-up of as much as 12¢ or 13¢. (Id.). Southside had negotiated an agreement with ExxonMobil wherein ExxonMobil would sell its fuels to Southside at a per gallon price that was "considerably lower" than the price it charged to other distributors. (Id. ¶ 39). Southside then calculated the rack price based on the non-discounted prices ExxonMobil charged other distributors instead of its own discounted

3

price, which it regarded as "something different." (Id.).

When Plaintiffs realized that the prices Southside charged other Maryland ExxonMobil stations with open-price term contracts were "considerably lower than the prices" Southside charged Plaintiffs "for the very same products, at the very same time," they asked Southside to provide ExxonMobil's rack prices so they could determine if Southside was charging them more than the permitted cents-per-gallon amounts. (Id. ¶ 40). Southside provided Plaintiffs with price information, which showed that Southside's prices to Plaintiffs were considerably higher than the applicable cents-per-gallon amount above the rack prices, despite Southside's claim that they were not. (Id. ¶¶ 41, 43). Southside told Plaintiffs that "rack prices" within the meaning of their contracts were not what Southside paid to ExxonMobil but rather the prices ExxonMobil charged other distributors who did not have a special discounted agreement. (Id. ¶¶ 42–43).

In order to earn a profit, Plaintiffs had to raise their retail prices above a competitive level. (Id. ¶ 45). As a result, Plaintiffs lost business to their lower-priced competitors, including other Maryland Exxon dealers who purchased from Southside at lower prices. (Id.).

On March 27, 2017, Plaintiffs sued Southside. (ECF No. 1). In their five-count Amended Complaint, they allege: Breach of Contract – Pricing (Count I); Breach of Contract – Rebates (Count II); violation of 15 U.S.C. § 13 (2018) – Price Discrimination (Count III); Lack of Consideration for the Arbitration Provision (Count IV); and Arbitration Provision – Unlawful Waiver of Rights (Count V). (Am. Compl. ¶¶ 48–81).

On March 30, 2018, the Court dismissed Counts IV and V, and compelled Plaintiffs

to arbitrate Counts I and II. (Mar. 30, 2018 Mem. Op. at 27, ECF No. 38). The only remaining claim before this Court, therefore, is Count III, for which Plaintiffs request declaratory and injunctive relief. (Am. Compl. at 23).

On April 30, 2018, Southside filed its Motion for Judgment on the Pleadings. (ECF No. 43). On May 14, 2018, Plaintiffs filed an Opposition. (ECF No. 46). Plaintiffs contemporaneously filed their Motion for Leave to File a Second Amended Complaint, seeking to address the deficiencies in Count III of its Amended Complaint. (ECF No. 47). On May 29, 2018, Southside filed its Reply, (ECF No. 48), and its Opposition to Plaintiffs' Motion (ECF No. 49). To date, the Court has no record the Plaintiffs filed a Reply.

## II.  DISCUSSION

### A.  Southside's Motion for Judgment on the Pleadings

#### 1.  Standard of Review

Southside moves under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. "Under Rule 12(c), a party may move for judgment on the pleadings any time after the pleadings are closed, as long as it is early enough not to delay trial." Prosperity Mortg. Co. v. Certain Underwriters at Lloyd's, No. GLR-12-2004, 2013 WL 3713690, at *2 (D.Md. July 15, 2013). The pleadings are closed when the defendant files an answer. See Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405 (4th Cir. 2002).

A Rule 12(c) motion is governed by the same standard as Rule 12(b)(6) motions to dismiss. Id. at 406. The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting

Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom. Goss v. Bank of America, NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

**2. Analysis**

In Count III, Plaintiffs allege a violation of the Robinson-Patman Act of 1936 (the "RPA"). The RPA, an amendment to § 2a of the Clayton Antitrust Act, prohibits price discrimination by producers. 15 U.S.C. § 13. A business violates the RPA when it sells two of the same or similar products at different prices to different buyers within a brief period and those sales cause injury to competition. Id. at § 13(a).[3] There are three categories of competitive injuries that give rise to an RPA claim: primary line, secondary line, and tertiary line. See Volvo Trucks N. America, Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 176 (2006). Here, Plaintiffs allege a secondary-line injury, which involves price discrimination that injures competition among the discriminating seller's customers, typically referred to as "favored" and "disfavored" purchasers. Id.; see Texaco Inc. v. Hasbrouck, 496 U.S. 543, 558 n.15 (1990).

To establish a prima facie case of secondary-line injury under the RPA, Plaintiffs must show that: (1) the fuel sales were made in interstate commerce; (2) the fuel sold to them was of "like grade and quality" as that sold to the other buyers; (3) Southside

---

[3] Section 13(a) of the RPA, in relevant part, states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition . . . .

15 U.S.C. § 13(a).

discriminated in price between Plaintiffs and other fuel purchasers; and (4) the effect of such discrimination was "to injure, destroy, or prevent competition" to the advantage of the other purchasers. Volvo Trucks, 546 U.S. at 176 (quoting 15 U.S.C. § 13(a)).

The Court's March 30, 2018 Memorandum Opinion concluded that Plaintiffs had adequately stated a claim as to the third and fourth elements of the RPA claim. ((Mar. 30, 2018 Mem. Op. at 22–27, ECF No. 38). The Court did not address the second element because Southside did not dispute it in its motion to dismiss. (See id.). However, Southside now asserts that Plaintiffs do not state a claim as to the second element of the RPA. It asserts that, "because the gasoline was not purchased on like terms and conditions, pursuant to established case law, the goods themselves cannot be of 'like grade or quality,' an essential element of an RPA claim." (Def.'s Mem. Supp. Mot. J. Pleadings ["Def.'s Mot."] at 2, ECF No. 43-1). The Court agrees.

The Supreme Court has established that the RPA "proscribes unequal treatment of different customers in comparable transactions." F.T.C. v. Borden Co., 383 U.S. 637, 643 (1966). In Borden, the Court determined that physically or chemically identical products sold under both nationally advertised and private labels are of "like grade and quality," because "economic factors inherent in brand names and national advertising should not be considered in the jurisdictional inquiry under the statutory 'like grade and quality' test." Id. at 645–46 (quoting Report of The Attorney General's National Committee to Study the Antitrust Laws 158 (1955)). The Supreme Court applied this holding in a subsequent case regarding the sale of branded and unbranded gasoline, noting that branded gasoline and unbranded gasoline are "of like grade and quality." Texaco Inc., 496 U.S. at 556 n.14.

8

While the United States Court of Appeals for the Fourth Circuit has not addressed the standard for determining whether goods sold under different contract terms are of "like grade and quality" for the purposes of the RPA, several other federal circuit courts have. See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171 (9th Cir. 2016); Cleveland v. Viacom, Inc., 73 F.App'x 736 (5th Cir. 2003) (unpublished); Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 990 F.2d 25 (1st Cir. 1993); A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396 (7th Cir. 1989); FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019 (2d Cir. 1976). These cases provide the Court with adequate guidelines by which to evaluate Plaintiffs' allegations. The Court now considers whether the Amended Complaint sufficiently alleges that the fuel sold to Plaintiffs was of like grade or quality as that sold to other buyers under different contract terms.

In A.A. Poultry, the Seventh Circuit determined that eggs crated and sold immediately were not of like grade and quality as eggs segregated from on-line egg production, known as "specials." 881 F.2d at 1407–08. The court reasoned that, "[a]lthough 'special' eggs as delivered may be physically indistinguishable to the buyer, they are not fundamentally the same good, for the same reason a seat on the 6:00 a.m. flight from Chicago to New York is not the same as a seat on the 5:00 p.m. flight, and a seat on the 5:00 p.m. flight reserved two weeks in advance is not the same as a seat on that flight for which the passenger had to stand by." Id. at 1408. The court also noted that "[n]o one supposes that a seller must charge the same price on contracts signed at different times, or on long-term contracts and spot sales." Id. at 1407.

9

Likewise, in Viacom, the Fifth Circuit found no violation of the RPA where retail video stores received a lower price through their agreements to purchase an entire output of videos under long-term purchase obligations, whereas other retailers paid more because they could choose the titles to purchase after learning of the box office results. 73 F.App'x at 741. The court concluded, "[a]s a result of the significant differences . . . between the terms of the agreements, any disparities in amounts paid cannot support a claim for price discrimination." Id.

The Ninth Circuit has also held that "[u]nlawful secondary-line price discrimination exists only to the extent that the differentially priced product or commodity is sold in a 'reasonably comparable' transaction." Aerotec, 836 F.3d at 1188 (quoting Tex. Gulf Sulphur Co. v. J.R. Simplot Co., 418 F.2d 793, 807 (9th Cir. 1969)). In Aerotec, the plaintiff, an independent servicer of Honeywell products, alleged that Honeywell discriminated against it under the RPA by giving greater discounts off the catalog price for the same replacement parts to Honeywell-affiliated servicers. Id. at 1187–88. The Ninth Circuit explained that the plaintiff was "mistaken in its premise that any transactional differences are not reflective of materially different terms," because "servicers under an affiliate contract are subject to substantial obligations that are not imposed on independent repair shops like [the plaintiff]." Id. at 1188.

Finally, the Second Circuit has also adhered to the principles outlined above, finding no RPA violations when varying prices were the result of "different terms of sale." FLM Collision Parts, 543 F.2d at 1026 ("The [RPA], as its language indicates, requires equality of treatment among purchasers, but it does not require a seller to adopt a single uniform

price under all circumstances."); see Coalition For A Level Playing Field, LLC v. Autozone, Inc., 737 F.Supp.2d 194, 216–17 (S.D.N.Y. Sept. 7, 2010) (noting that the "[RPA] does not prohibit price differences that reflect materially different contract terms" and that "[t]he complaint . . . ignores the possibility that these contract differences account for the lower prices paid by the retailer defendants").

In this case, there is no question that the commodities at issue are physically identical: Exxon-branded gasoline and diesel. As the case law from other circuits makes clear, however, physically identical products are not always "of like grade and quality" for the purposes of the RPA. Even if they are physically identical, goods that are sold under "materially different terms" are not "of like grade and quality." Plaintiffs argue that the differences in the contracts—specifically, the Plaintiffs' twenty-year supply contract with "rack plus" pricing versus their competitors' "short-term ([three] year) open-price term contracts"—are not materially different terms, and consequently, do not affect the "grade and quality" of the fuel at issue. (Pls.' Resp. Opp'n Def.'s Mot. J. Pleadings ["Pls.' Opp'n"] at 2–3, ECF No. 47). The Court is not persuaded.

The fuel sold in this case is akin to the eggs sold in A.A. Poultry and the videos sold in Viacom, where the physically identical eggs and physically identical videos, respectively, were sold under materially different contract terms, rendering the products not of like grade and quality. See A.A. Poultry, 881 F.2d at 1407–08; Viacom, 73 F.App'x at 741. Here, the Amended Complaint alleges that Plaintiffs' competitors "purchased under open-price term contracts," which it specifically distinguishes from its own negotiated "rack plus" pricing formula. (Am. Compl. ¶¶ 12–13, 40). Plaintiffs state, "Under an 'open-

price term' contract, there is no practical limit on the per gallon profit the seller can earn. That is, the seller can mark up the product over its cost to whatever extent the market will bear, with no per gallon ceiling on the amount of the seller's profit margin." (Id. ¶ 12). Under 'rack plus' pricing, by contrast, Southside could only charge Plaintiffs a certain number of cents over and above ExxonMobil's "rack price." (Id. ¶¶ 13–15, 26). It is not surprising, then, that these two clearly different pricing terms resulted in different fuel prices for Plaintiffs and their competitors. The difference between the fuels at issue are the result of separately negotiated pricing contracts, as specifically alleged in the Amended Complaint, (Am. Compl. ¶¶ 12–13, 26, 40), and not a result of being branded or unbranded Borden, 383 U.S. at 640.

In their Opposition to Southside's Motion, Plaintiffs also concede that the contracts contain material differences. They state, "[l]ong-term and short-term open-price term contracts are fundamentally different." (Pls.' Opp'n at 3). While Plaintiffs attempt to argue that these "fundamental" differences are not "material" differences, they later argue that "the only 'material differences' between Plaintiffs' contracts and the open-price term contracts do not justify the lower prices charged to Plaintiffs' competitors." (Id. at 13). Instead "these differences would support lower prices to Plaintiffs." (Id.). This argument, however, only supports the notion that the fuel sold to Plaintiffs is not of like grade and quality as that sold to its competitors.

Plaintiffs next argue that, if the lower price had been in their favor, there would be no RPA violation because they bargained for that lower price, but because the lower price is not in their favor, then there is an RPA violation. The RPA and antitrust law are not so

fickle, nor are they meant to counteract the effects of knowledgeably negotiated contract terms. The RPA "signals no large departure from antitrust law's primary concern, interbrand competition." Volvo Trucks, 546 U.S. at 168.

In sum, the Court concludes that, based on the Amended Complaint's allegations, Plaintiffs fail to plausibly allege that the fuel they bought from Southside is of like grade and quality as the fuel Southside sold to other retailers. Just as the Twombly Court dismissed an antitrust conspiracy complaint in a case "with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support an antitrust claim," the Court sees no "reasonably founded hope" that discovery in this antitrust case will reveal relevant evidence to support Plaintiffs' RPA claim. See 550 U.S. at 559–60 (alteration in original) (internal quotations omitted) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005)). Therefore, the Court will grant Southside's Motion for Judgment and dismiss Count III of the Amended Complaint.

## B. **Plaintiffs' Motion for Leave to File a Second Amended Complaint**

### 1. **Standard of Review**

Rule 15(a)(2) provides that "[t]he court should freely give leave [to amend a complaint] when justice so requires." Justice does not require permitting leave to amend when amendment would prejudice the opposing party, the moving party has exhibited bad faith, or amendment would be futile. See Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 446 (4th Cir. 2001) (citing Edwards v. Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999)). Leave to amend is futile when an amended complaint could not survive a motion to dismiss for failure to state a claim. See U.S. ex rel. Wilson v. Kellogg

Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008). "Leave to amend, however, should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face." Johnson v. Oroweat Foods Co., 785 F.2d 503, 510 (4th Cir. 1986) (citing Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir. 1980)).

### 2. Analysis

Plaintiffs request leave of the Court to file a Second Amended Complaint to cure the identified deficiencies in Count III of their Amended Complaint. Southside contends that granting Plaintiffs leave to amend would be futile because the Second Amended Complaint is deficient on its face and cannot survive a motion to dismiss. The Court agrees with Southside.

In an effort to address the deficiencies in their Amended Complaint, Plaintiffs' new allegations "compare and contrast the contracts, describe their differences and similarities, and the basis on which they do not result [in] non-comparable transactions that affect the grade or quality of the products sold." (Mem. P&A Supp. Pls.' Mot. Leave File 2d Am. Compl. ["Pls.' Mot."] at 7, ECF No. 47-2).[4] Plaintiffs state that they "were not given the opportunity to enter a three-year open-price term contract like the ones entered between Southside and Plaintiffs' competitors." (2d Am. Compl. ¶ 10, ECF No. 47-4). They name the original price ExxonMobil charged Southside—"Posted Price"—and the new price

---

[4] In their Motion, Plaintiffs list their proposed amendments by paragraph number. (Pls.' Mot. at 2–5). But some of those paragraph numbers and allegations do not line up with those in the proposed Second Amended Complaint. (Compare Pls.' Mot. ¶¶ 38–40, 48–50, with 2d Am. Compl. ¶¶ 35–37, 45–46). Where they conflict, the proposed Amended Complaint controls, not the Motion's summary of the amendments.

14

ExxonMobil started charging Southside in 2015—"Formula Price." (Id. ¶ 35). Plaintiffs then state their dispute with Southside "centers on the meaning of the term 'Rack.'" (Id. ¶ 36). Specifically, Plaintiffs believe "rack" should mean the Formula Price, whereas Southside maintains it means the Posted Price. (Id.). Further, they allege that their rack-plus price term contracts and competitors' open-price term contracts "are not substantively different from one another with respect to credit, terms of payment, credit card processing, payment of credit card fees, trademark protection, service station image and appearance standards, minimum purchase requirements, taxes and fees associated with the products, and the terms governing resale of the products to consumers." (Id. ¶ 45). Plaintiffs make the argument discussed above that, if anything, the differences between their contracts and those their competitors negotiated mean Southside should them a lower, not a higher, price. (Id. ¶ 46). Plaintiffs argue that because their competitors' open-price contracts vest pricing discretion in Southside, that Southside exercised its discretion to charge Plaintiffs' competitors less than Plaintiffs, which has injured Plaintiffs.

While Plaintiffs' new allegations give more context to the formation and substance of their contracts with Southside, they cannot escape the "fundamental" difference that persists between their contracts and their competitors' contracts: the rack-plus price term and the open-price term. The Second Amended Complaint maintains this distinction when it states, "[u]nder Plaintiffs' contracts with Southside, the per gallon price is a certain cents-per-gallon (e.g., [three] cents, four cents) over 'Rack,'" and "[t]he open-price term contracts of Plaintiffs' competitors vest discretion in Southside, subject to the UCC's 'good faith' requirement, to set the prices for sales to retailers." (2d Am. Compl. ¶¶ 36–37).

15

Plaintiffs even concede that certain other contractual differences could justify differences in price, but argue that those differences should only be in their favor: "[a]lthough there are non-price differences between the [P]laintiffs' contracts and the open-price term contracts, the differences do not justify a lower per gallon price to [P]laintiffs' competitors." (Id. ¶ 46). As explained above, this argument is incompatible with the purpose of antitrust law and the RPA. See Volvo Trucks, 546 U.S. at 176 ("Mindful of the purposes of the [RPA] and of the antitrust laws generally, we have explained that [the RPA] does not 'ban all price differences charged to different purchasers of commodities of like grade and quality'; rather, the Act proscribes 'price discrimination only to the extent that it threatens to injure competition.'") (quoting Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 220 (1993)). Here, Plaintiffs' "rack-plus price" term is the product of its own negotiation with Southside, a contract term that the Second Amended Complaint identifies as "the most important provision to be negotiated" with Southside. (2d Am. Compl. ¶ 10). The purpose of the RPA or antitrust law is not to undo that negotiation in order to give Plaintiffs the result they expected but did not receive.

In addition, as noted above, there is no "reasonably founded hope" that discovery will reveal relevant evidence to cure Plaintiffs' claim, because the pricing differences are inherent in the contracts themselves, and no amount of fact-finding could change what has already been negotiated and settled. Plaintiffs' amendments simply do not justify the burdensome expense of discovery, particularly in the antitrust context. See Twombly, 550 U.S. at 558 ("[I]t is one thing to be cautious before dismissing an antitrust complaint in

advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.").

After reviewing the proposed Second Amended Complaint, the Court concludes that the amendments are clearly insufficient on their face because the deficiencies present in the Amended Complaint persist. See Kellogg Brown & Root, 525 F.3d at 376; Johnson, 785 F.2d at 510. Thus, the Court concludes that leave to amend would be futile and will deny Plaintiffs' Motion.

The Court is mindful that the effect of this ruling will be to limit the Plaintiffs' claims for relief to their breach of contract claims in arbitration. (Mar. 30, 2018 Mem. Op. at 27 ("The Court will deny the Motion to Dismiss without prejudice as to Counts I and II because those Counts will be submitted to arbitration.")). This is appropriate because, as Plaintiffs state in their proposed Second Amended Complaint, their dispute with Southside "centers on the meaning of the term 'Rack,'" (2d Am. Compl. ¶ 36), a quintessential question of contract interpretation.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Southside's Motion for Judgment on the Pleadings (ECF No. 43) and deny Plaintiffs' Motion for Leave to File a Second Amended Complaint (ECF No. 47). A separate Order follows.

Entered this 29th day of March, 2019.

/s/
George L. Russell, III
United States District Judge